**SARGO, II, INC. t/a The Dorchester on Rittenhouse Square Partners**

v.

**The CITY OF PHILADELPHIA.**

Civ. A. No. 79–4655.

United States District Court,
E. D. Pennsylvania,
Civil Division.

Feb. 11, 1980.

On Motion for Summary Judgments
March 10, 1980.

Jerome J. Shestack, Michael Sklaroff, Nicholas E. Chimicles, Philadelphia, Pa., for plaintiff.

Carl Singley, Philadelphia, Pa., for defendant.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

This diversity action for the first time requires a court to interpret the recently adopted condominium conversion ordinance of the City of Philadelphia, Title 9 Chapter 9–1200 et seq. The controversy arises out of the refusal of the City to issue use permits and certificates to any owner wishing to sell condominium units unless that owner certifies that he has complied with the condominium conversion ordinance. Since under 21 P.S. § 611 et seq. a use permit must be obtained before selling real property in Pennsylvania, the City's refusal to issue permits may prevent the sale of condominium units or create a substantial cloud on the title. If an owner has not given notice of conversion to his tenants pursuant to the Ordinance, he will not receive the use permits needed to sell the units. In this suit the owner of The Dorchester, a property located at 226 West Rittenhouse Square in Philadelphia, seeks a declaration that the Ordinance may not be enforced against it and that the permits should be issued. In an order dated February 1, 1980, I held that § 9–1204 of the Ordinance applies to the conversion of The Dorchester. This memorandum provides the factual basis and reasons for that order.

In addition to raising various state and federal grounds, plaintiff contends that because the declaration submitting The Dorchester to the provisions of the Unit Property Act, 68 P.S. § 700.101 et seq., was recorded prior to enactment of the City Ordinance, the Ordinance does not apply to The Dorchester.[1] The City asserts that The Dorchester must comply with the provisions of § 9–1204 regulating unfair conversion practices since that part of the Ordinance was pending when the declaration was filed, and no license has yet been issued. The City does not seek to enforce the moratorium provisions of the Ordinance, § 9–1206. Because The Dorchester had already commenced its sales promotion program and thus desired prompt resolution of the dispute, the court agreed to consider initially the limited question of whether § 9–1204, establishing inter alia, the contents of the notice to be sent to the tenants, could be applied to The Dorchester. The parties agreed that if this issue was decided adversely to plaintiff, the court would subsequently consider the other grounds.

### A.

Plaintiff asserts that the language of § 9–1204 reveals City Council's intention to apply its provisions only to buildings which had not converted to condominiums prior to enactment of the Ordinance on September 27, 1979. Section 9–1204(1)(a) provides that the conversion shall be unlawful unless the tenant has been notified in writing "of the owner's intention to convert to a condominium by a date certain specified therein, which notice shall be delivered one year prior to the date of the scheduled conversion." According to plaintiff, conversion occurs with the recording of the declaration pursuant to the Unit Property Act. Under this view, "the owner of a previously converted condominium cannot give prior notice of an intention to convert when conversion already has been accomplished." Plaintiff's Memorandum of Law at 10–11 (emphasis in original). Although plaintiff recognizes that the "pending ordinance doctrine" may at times deny any benefit to a party who rushed to procure a permit before an anticipated change in the law occurred, it would confine that doctrine to zoning laws. The City, on the other hand, disagrees with plaintiff's view of the intent of the Council, and would extend the pending ordinance doctrine to condominium conversion requirements.

---

1. The condominium declaration for The Dorchester was filed on August 24, 1979 and amended on September 4, 1979 and September 14, 1979. On September 27, 1979 the Ordinance was enacted. The Ordinance was pending prior to August 24, 1979.

■ Developed to restrict the ability of property owners to commence non-conforming uses while amendments to zoning ordinances were pending, the pending ordinance doctrine prohibits a property owner from hastily procuring a valid building permit prior to the enactment of the ordinance. "[A] building permit may be refused if at the time of application there is pending an amendment to a zoning ordinance which would prohibit the use of the land for which the permit is sought." *Boron Oil Co. v. Kimple*, 445 Pa. 327, 329, 284 A.2d 744, 746 (1971) (citations omitted). Moreover, even a validly issued building permit may be revoked in the interest of fairness when the landowner raced to obtain the permit before a proposed change was made in the zoning ordinance. *Penn Township v. Yecko Brothers*, 420 Pa. 386, 217 A.2d 171, *cert. denied*, 385 U.S. 826, 87 S.Ct. 60, 17 L.Ed.2d 63 (1966).

Because the Supreme Court of Pennsylvania has not addressed the question of whether the pending ordinance doctrine applies to ordinances other than zoning, in this diversity action we can only attempt to predict how the Supreme Court of Pennsylvania would rule if confronted with the issue. Most probably, the doctrine would apply.

First, the state legislature has established a similar enforcement mechanism, i. e., the use permit procedure, to insure compliance with both zoning and housing ordinances. The use permits verify "the zoning classification and the legality of the existing use of the property to be sold", 21 P.S. § 613(a), as well as "whether there exists any notice of an uncorrected violation of housing, building, safety or fire ordinances." 21 P.S. § 613(b). The state legislature thus revealed the strong public interest in a seller's compliance with these ordinances. The pending ordinance doctrine is partly based on a balance between the interest of a municipality in effecting a change in its zoning laws and the interest of the individual property owner in being free from lengthy restraints upon the use of his property. *See Boron Oil*, 445 Pa. at 332, 284 A.2d 744 (determining when an ordinance becomes pending). The similar municipal interests in zoning and housing and the comparable enforcement mechanism support a similar policy balance and an extension of the pending ordinance doctrine.

Secondly, the process required to enact or change zoning or condominium ordinances can be lengthy and in both cases substantial and permanent injury to the public interest may occur in the interim. Just as racing to establish a nonconforming prior use may permanently hamper control of land use, so racing to convert to a condominium may frustrate attempts to prevent rapid displacement of tenants or ill-considered decisions to purchase. If a building owner could avoid the provisions of a new condominium ordinance simply by filing a declaration in anticipation of the change, the City Council's attempt to minimize the subsequent dislocation would be futile. Both condominium and zoning ordinances would be furthered by limiting a landowner's ability to change his position in anticipation of the passage of the ordinance.

■ Finally, because plaintiff seeks equitable relief the court must determine if it has acted fairly. The criteria established under the pending ordinance doctrine expressly relate to the fairness of the landowner's activity in seeking to avoid application of a pending ordinance. Thus, they seem to be the standards a Pennsylvania court would most likely employ.[2]

---

**2.** The cases plaintiff cites as limiting the pending ordinance doctrine to zoning ordinances involve policies different from those in the present case. In *Monumental Properties, Inc. v. Bd. of Commissioners of the Township of Whitehall*, 11 Pa.Cmwlth. 105, 311 A.2d 725 (1973) and *Vogel v. Hopewell Township Bd. of Supervisors*, 27 Pa.Cmwlth. 118, 365 A.2d 706 (1976), the court expressly relied on the legislative judgment codified in 53 P.S. § 10508(4) that preliminary land development plans may not be disapproved on the basis of subsequently enacted zoning laws. A developer who spent considerable resources formulating a land development plan should not be required to alter it. *Id.* In the present case, we have neither an express legislative judgment nor a

Having decided that the present case falls within the scope of the pending ordinance doctrine, we now must explore whether in light of that doctrine § 9–1204 of the Ordinance applies to The Dorchester. In our prior discussion we found that the ordinance when read in conjunction with the pre-existing use permit certification procedure imposed an approval requirement for condominium conversions similar to a zoning permit. In deciding prior to the time of sale whether to issue the use permit, the City must determine whether the Ordinance's notice requirements have been satisfied. Under the pending ordinance doctrine, the approval may be denied on the basis of the law pending at the time the declaration was recorded. *See Boron Oil Co., supra.* Even if we deem the date of the request for approval to be the time of the filing of the declaration, the condominium ordinance was pending and its requirements must therefore be satisfied.[3]

Putting aside the application for a use permit, we focus upon another line of cases under the pending ordinance doctrine pertaining to reliance on a validly issued building permit. Plaintiff contends that filing the condominium declaration was the crucial event with no other approval required. Assuming *arguendo* that filing the declaration is the equivalent of obtaining a building permit, plaintiff still cannot meet the doctrine's requirements. In *Penn Township v. Yecko Brothers*, 420 Pa. 386, 390–91, 217 A.2d 171, *cert. denied*, 385 U.S. 826, 87 S.Ct. 60, 17 L.Ed.2d 63 (1966), the Supreme Court of Pennsylvania ruled that a property owner has a vested right in a building permit only if the following conditions are satisfied:

(1) that he has obtained a valid building permit under the old zoning ordinance, (2) that he got it in good faith—that is to say without "racing" to get it before a proposed change was made in the zoning ordinance—and (3) that in good faith he spent money or incurred liabilities in reliance on his building permit . . . . .

The second part of the rule is plaintiff's chief obstacle. As part of the agreement of sale for The Dorchester, plaintiff (the purchaser) required the seller to file the declaration submitting the property to the Unit Property Act. The Agreement forbid plaintiff from selling any units prior to settlement. Since immediate sale of units was not contemplated, we infer from this sequence of events that the prime reason plaintiff required the prior owner to file the declaration was to obtain the benefits of the filing before the pending ordinance passed City Council. This is precisely the "race" that the pending ordinance doctrine was designed to avoid. Consequently, the law to be applied is the City Council ordinance pending at the time the declaration was filed.

### B.

Although the parties have framed the issue as the retrospective application of the Ordinance, when the Ordinance is closely scrutinized, many of its requirements have *prospective* application to The Dorchester. Plaintiff contends that the retrospectivity question arises because the Ordinance requires that notice be given "one year prior to the date of the scheduled conversion." But "conversion" is not defined in the Ordinance or in the Unit Property Act.[4] Even

---

requirement that the condominium declaration be modified.

In *191 Tenants Assoc. v. Triester*, 98 Montg. Co.L.R. 206 (1974), *aff'd per curiam*, 463 Pa. 143, 344 A.2d 466 (1975), the ordinance was not pending when the condominium documents were filed. In the present case, the ordinance was pending prior to the filing of the declaration.

**3.** While no application for use permit was filed, there is no dispute that the application would have been denied.

**4.** The legislative history reveals the ambiguous use of the word "conversion". *See* Transcript of Proceedings conducted by the Committee on Rules, August 8, 1979, at 77, 87 and 108. The Council seemed to believe that "conversion" causes the displacement of tenants. If an owner filed a declaration but did not sell units, no displacement would occur. Consequently, intention to convert is best viewed as including an intention to sell units.

if we assume that recording the declaration converts the property to a condominium under the Unit Property Act, we are unconvinced upon review of the Ordinance that "conversion" was meant in this technical sense. Indeed, the provisions of the notice requirement itself relate primarily to the sale of units rather than to the filing of the declaration.

■■■ For example, at this time the chief dispute between the City and plaintiff concerns compliance with § 9–1204(1)(b) which states as follows:

> It shall be unlawful for any owner . . to convert said premises to a condominium . . . unless . . . (b) the notice of intention to convert contains a statement informing the tenant then in possession of his or her exclusive right to purchase their unit at a specified price during the first 6 months of the notice period. During the right-to-purchase period, the owner or his agent cannot show the unit to other prospective buyers unless the tenant has in writing waived the right to purchase.

Interpreting this provision to require that the tenant's right to purchase his unit commences one year before the property may be submitted to the provisions of the Unit Property Act would be anomalous. The owner's right to convey units in a building is based upon the enabling statute (the Unit Property Act) and cannot precede the recording of the declaration.[5] A "right to purchase" period cannot predate the right to convey units. Thus the Ordinance's language itself provides some evidence that City Council sought to regulate the sale of units rather than the submission of the property to the Act.[6]

■ When the statutory language is susceptible to differing interpretations, the purposes of the statute may provide guidance. See 1 Pa.C.S.A. § 1921 (1979 Supp.). That the sale of units rather than the recordation of the declaration was the subject of legislative concern is apparent from the legislative findings. Sections 9–1201(3), (4) provide:

> (3) The cost of purchasing a unit, in many cases, is far greater than paying the monthly rental fee for the unit and it is often extremely difficult for the tenant to get his or her finances in order quickly enough to determine whether purchasing their unit is economically feasible.
>
> (4) This situation can lead to the displacement or eviction of tenants, many of them elderly who have lived in their rental units for years with the intention of making their unit their permanent residences.

Regardless of whether the building is a condominium, unless units are sold the purchase or dislocation problems forseen by City Council will not come to pass. The one year prior notice requirement seems designed to give tenants a year before they

---

At present, we do not decide whether the mere filing of a declaration, pursuant to the Unit Property Act, "converts" the property to a condominium as a matter of real property law.

**5.** At common law a condominium could be created by conveying a unit to each purchaser in fee plus a percentage interest in the land and structural portions of the building (by a tenancy-in-common). J. Krasnowiecki, *Townhouse Condominium Compared to Conventional Subdivision with Homes Association*, 1 Real Estate L.J. 323, 324 (1975). *See also*, R. Glazer, *Pennsylvania Condominium Law and Practice*, § 3.02 at 2–4. But the condominium enabling statutes in effect create a new property interest. Krasnowiecki, *supra* at 324. Condominiums created under that statute are creatures of the state. Glazer, *supra* § 1.04 at 9. To execute valid deeds under the Unit Property Act,

the property must first be submitted to the provisions of the Act.

**6.** Other provisions of the notice requirement also pertain to the sale of the property rather than the submission of the property to the Act. For example, § 9–1204(1)(d) mandates disclosure of expenditures for all repairs within the last three years. A tenant living in a building whose owner filed the declaration but continued to rent the units would have no need to see the repair bills. Only if he were offered the option to purchase the unit does reviewing repair bills seem relevant. In the case of The Dorchester, notices that units were available for sale were not sent to tenants until December 2, 1979, well after the enactment of the Ordinance. Prior to that date, residents were told the building would continue to operate as an apartment.

can be forced out of their apartments. For the first six months of that year they are given the right to purchase their apartment. In the present case, the sales program did not commence until after September 27, 1979 (the date the Ordinance was enacted) and thus, the notice provisions are being applied prospectively to the sale of units at The Dorchester.

## ON MOTION FOR SUMMARY JUDGMENT

The Dorchester is a luxury high rise building located on Rittenhouse Square in Philadelphia. On December 2, 1979, the owner of The Dorchester [1] notified tenants that their apartments would be sold as condominium units. Shortly thereafter, it instituted the present action for declaratory and injunctive relief seeking to avoid the restrictions of the condominium conversion Ordinance of the City of Philadelphia, Title 9 Chapter 9–1200 *et seq.* In its complaint, plaintiff set forth the following three sets of arguments: that the Ordinance did not apply to The Dorchester because it filed a declaration under the Unit Property Act prior to the passage of the Ordinance, that the marketing program at The Dorchester substantially complied with the Ordinance and that the Ordinance violated the Pennsylvania and United States Constitutions. In our February 11, 1980 memorandum we stated the reasons for rejecting the first of these arguments and holding that § 9–1204 applied to The Dorchester. Plaintiff then filed a motion for summary judgment on the ground that it substantially complied with the Ordinance.

The issue currently before the court is whether alleged deficiencies in plaintiff's marketing program prevent a valid conveyance of condominium units. Plaintiff contends that substantial compliance with the Ordinance is sufficient; it need not precisely meet each requirement. Defendant, on the other hand, insists on strict compliance with each provision of § 9–1204. Pursuant to a written opinion by the City Solicitor on December 18, 1979, the City refuses to issue any permits or Certification Statements needed for a lawful conveyance of the units unless the applicant certifies that he has fully complied with all the provisions of § 9–1204. Our initial task is to choose the appropriate standard for assessing plaintiff's compliance and next to determine whether that standard has been met.

■ In Pennsylvania the distinction between strict and substantial compliance arises when courts are required to determine whether a transaction is void for failure to follow a statutory requirement. The degree of compliance necessary often depends upon whether a statutory provision is mandatory or directory. In *Fishkin v. Hi-Acres, Inc.*, 462 Pa. 309, 341 A.2d 95 (1975), the Supreme Court of Pennsylvania stated that noncompliance with directory language creates a "voidable" transaction, while noncompliance with mandatory provisions renders the transaction "void *ab initio*." *Id.* at 98, 341 A.2d 95. The Court explained: "Failure to conform to a mandatory procedure renders the activity a nullity. Strict compliance with a directory provision, on the other hand, is not essential to the validity of the transaction or proceeding involved." *Id.* at 98 n.5, 341 A.2d at 98 (citation omitted). Thus where mandatory language is involved a court will declare a transaction void for failure to comply strictly with a provision. Where directory language is at issue, a court in its discretion may choose not to void the transaction if the statute was substantially followed.[2]

1. The Dorchester is owned by a limited partnership whose sole general partner is Sargo II, Inc. Robert Sheridan is the President of Sargo II.

2. We note that one Pennsylvania court has found a statute to be "mandatory—but with the caveat that a valid attempt . . . coupled with substantial though incomplete compliance" should not void the transaction. *Black and Brown, Inc. v. Home for the Accepted*, 233 Pa.Super. 518, 335 A.2d 722, 724 (1975). If labeling a provision mandatory simply signifies that any proceeding not in compliance is void *ab initio*, logically it would be possible to demand either strict or substantial compliance with a mandatory provision. But this view seems contrary to the Supreme Court's language in *Fishkin* that mandatory provisions must be strictly followed. *See also, Tausig v.*

■■■ To distinguish between mandatory and directory language, courts may look to the purposes of the act and the equities inherent in the construction chosen. The Supreme Court of Pennsylvania stated the considerations as follows:

> Whether a particular statute [or provision] is mandatory or directory, does not depend upon its form, but upon the intention of the legislature, to be ascertained from a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other. *Deibert v. Rhodes*, 291 Pa. 550, 140 A. 515, 517 (1928) (citations omitted).

*See also, Pleasant Hills Borough v. Carroll*, 182 Pa.Super. 102, 106–07, 125 A.2d 466, 469 (1956). "[W]hether a statute is mandatory or not depends on whether the thing directed to be done is the essence of the thing required . . . ." *Deibert*, 140 A. at 516 (citations omitted). Frequently the type of enactment will provide guidance in selecting the appropriate standard.[3] *Compare Tausig v. Lawrence*, 328 Pa. 408, 197 A. 235 (1937) (strict compliance with a constitutional provision is required) *with Fishkin, supra* (substantial compliance with corporate statute); *Hyde v. Pittsburgh Zoning Board of Adjustment*, 403 Pa. 415, 169 A.2d 547 (1961) (substantial compliance with zoning ordinance and building code); *Mikita v. Bailey Homes, Inc.*, 401 A.2d 1367 (Pa.Su-

per.1979) (substantial compliance with statute regulating appeals from arbitration awards).

Turning to the Ordinance, the essence of § 9–1204 is that a tenant be given notice that his apartment is scheduled for sale as a condominium unit and that he has the opportunity to purchase his unit. The specific contents of the notice provision serve the purposes of giving the tenant the time and information to make a considered choice whether to purchase and sufficient time to locate another apartment if the decision is made not to buy. Neither the Ordinance nor the legislative history reveals an intention of City Council to declare a sale void for failure to comply precisely with each requirement so long as the tenant is given sufficient time and information to make an informed, reasoned choice.[4] While a developer is not free to ignore the provisions of the Ordinance, to deny those tenants and nontenants desiring condominium ownership the opportunity to purchase units in every case where the Ordinance was not strictly followed at times may produce harsh results contrary to the balance of interest City Council sought to achieve. We find it appropriate to follow the doctrine of substantial compliance which focuses the court's attention on the spectrum of equitable considerations including whether plaintiff acted in good faith, whether it

---

*Lawrence*, 328 Pa. 408, 197 A. 235 (1937); *Deibert v. Rhodes*, 291 Pa. 550, 140 A. 515 (1928).

Perhaps the substantial compliance doctrine is a cluster of equitable considerations which come into play in deciding whether to void a proceeding when directory language is not followed. Although we agree that the mandatory-directory labels may not provide much assistance in interpreting a statute, *See Fishkin, supra*, (Roberts, J. concurring), we must abide by the majority's reasoning. Under either approach, however, it seems proper to assess the possible consequences of failure to comply strictly in light of the intent of City Council rather than to dwell upon the labels involved.

3. "In construing a statute, substantial compliance with detailed requirements as to the time in which an act may be done is frequently held sufficient, as long as the purpose of the act is effectuated, but a different attitude toward construction must be taken when procedural requirements of the Constitution are under con-

sideration." *Tausig*, 328 Pa. at 412–13, 197 A. at 237.

4. Contrary to defendant's argument, § 9–1204(6) prohibiting the waiver of the tenants' rights is not to the contrary. If plaintiff substantially complies with the Ordinance, tenants are not deprived of the benefits of § 9–1204. *See, e. g.*, Transcript of Proceedings Conducted by the Committee on Rules, August 8, 1979 at 80 discussing an owner's inability to provide repair bills for three years prior to the date of the notice as required by § 9–1204(d). Moreover, regardless whether the Unit Property Act should be strictly construed, see R. Glazer, Pa. Condominium Law and Practice § 1.05 at 9, the city Ordinance is not enabling legislation and thus may be interpreted differently. Indeed, the condominium Ordinance is similar to those statutes noted *supra* to which the doctrine of substantial compliance applies.

complied with the purposes of the Ordinance and whether invalidating the sale would produce inequitable results not intended by City Council.

From the outset, we wish to emphasize the unique circumstances of this case. Plaintiff commenced its marketing program believing that "conversion" as used in the Ordinance meant filing a declaration under the Unit Property Act. Since the declaration was filed prior to passage of the Ordinance, plaintiff felt the notice provisions of § 9–1204 were not applicable to The Dorchester. In our memorandum of February 11, 1980 we held that notice must be given one year prior to the date a tenant who did not want to purchase must vacate his apartment. On this basis or alternatively under the Pending Ordinance Doctrine, The Dorchester was subject to § 9–1204.

Because the Ordinance was susceptible to differing interpretations and plaintiff expended considerable resources in reliance upon its interpretation, it would be inequitable to impose a harsh remedy upon plaintiff. Plaintiff took significant steps to comply with the Ordinance in its initial notice despite the absence of an authoritative ruling that the Ordinance applied.[5] The same considerations would not pertain to an owner issuing notice subsequent to our February 11, 1980 opinion, and if presented with that case we might view deficiencies in the notice in a different light. Nevertheless, because plaintiff took significant steps to comply with the Ordinance in its initial notice despite the absence of an authoritative ruling that the Ordinance was applicable, plaintiff may properly seek equitable relief.

■ We next turn to the specific provisions of § 9–1204 of the Ordinance, set forth in full as an appendix to this opinion, to assess the extent of compliance and the relative hardship in now demanding strict compliance. As required by §§ 9–1204(1)(a)

and (3), the tenant was sent a notice that condominium units would be sold at The Dorchester. The notice was delivered on December 2, 1979 and provided each tenant with the option of remaining in his apartment under the same terms and conditions until December 31, 1980. Although the term "date of the scheduled conversion" is undefined in the Ordinance, we find that notice one year prior to the date a tenant who has not purchased must vacate his apartment satisfies the requirement. Plaintiff did not, however, send the notice certified mail, return receipt requested. Nevertheless, since there is no assertion that tenants failed to actually receive the notice or were prejudiced by this omission, plaintiff substantially complied with this provision. *See, e. g., Mikita v. Bailey Homes Inc., supra; Mertz v. Lakatos*, 33 Pa.Cmwlth. 230, 381 A.2d 497 (1978).

Section 9–1204(1)(b) affords each tenant the right to purchase his unit at a specified price during the first six months of the notice period. Rather than affording each tenant the exclusive right to purchase for six months, plaintiff's notice gave each tenant the exclusive right to purchase at a ten percent discount for the first two months, coupled with a right of first refusal for 30 days following any offer made by an outside purchaser during the succeeding two months. Elderly or disabled tenants might, under certain circumstances, continue to rent for up to two years. Recognizing that its notice fell short of the Ordinance's requirements, plaintiff now proposes to notify individually each tenant that his right to purchase is extended to June 2, 1980, i. e., six months after the original notice and to specify the price by stating the cost in dollars. In addition, plaintiff will not show the unit until the expiration of this period or the execution of a written waiver as provided in the Ordinance.

Because some tenants may already have felt pressure to purchase units, considerable

---

5. To be sure plaintiff's rush to have the declaration filed and its awareness that the notice provisions were already enacted when it issued its notice tarnished its good faith. The Ordinance was enacted on September 27, 1979 and notice of the sale of units at The Dorchester was issued to tenants on December 2, 1979. That plaintiff acted to meet the concerns of the Ordinance, however, molifies these factors.

doubt exists whether the extension adequately remedies this effect. However, because of the success of plaintiff's marketing program among the general public, we do not find that any tenant was prejudiced by the initial notice when supplemented as proposed. The Dorchester's units have all been sold, many at prices above the original discount. Most probably, those tenants who hurriedly purchased and now do not wish to take title will be able to sell their contracts of sale at a profit. Those tenants who did not purchase and wish more time to consider will have until June 2, 1980. While we recognize this provision is important in affording each tenant sufficient time to make a decision, declaring the sales void under the circumstances of this case would be overly harsh. Accordingly, we find that the marketing program as supplemented substantially complies with § 9–1204(1)(b).

Stating with specificity the total amount due on settlement in accordance with § 9–1204(c) requires information not available to plaintiff. Listed in the December 2 notice was a statement tabulated by unit including the price, the percentage interest assigned, the estimated monthly taxes and the estimated monthly condominium assessment. Items such as mortgage fees and other fees of lenders allegedly could not be approximated until the purchaser secured financing. In a letter to the court, plaintiff's attorney set forth precisely which further elements plaintiff is capable of providing to tenants. See Appendix B. Absent any evidence that more information could be provided, we find plaintiff's notice as supplemented substantially complies with § 9–1204(1)(c).

Despite the requirements of § 9–1204(1)(d), plaintiff's notice did not contain any information concerning payments for repairs or utilities during the last three years. Although plaintiff asserts in an affidavit that because it recently purchased the property it does not have exclusive possession of this data, it also states that it provided certain financial information to The Dorchester Residents' Committee. Sheridan Affidavit at ¶ 6. Disclosure to a committee partially meets the Ordinance's concerns but it may not provide each resident with the information he needs to determine his potential financial obligations. If plaintiff possesses or has access to data concerning expenditures which it is under no legal obligation to keep confidential, it must disclose that information in its notice to the tenants in the form specified in the Ordinance. If disclosure is not possible, plaintiff must state in its supplemental notice to the tenants that the Residents' Committee has seen the list of expenses and the reasons plaintiff may not disclose to the tenants the information it provided to the Residents' Committee.

The requirements of § 1204(e) were satisfied by the December 2, 1979 notice in the section entitled "Condominium Operating Budget." Plaintiff has agreed to comply with §§ 1204(3)–(7).

Section 9–1204(f) requires specific information concerning the structural components of the property, the expected useful life of each item and the estimated cost of replacement. The initial engineering report issued as part of the December 2, 1979 notice did not substantially comply with this provision because the dates of construction, expected useful life, and replacement costs were not set forth. The report did cover the current condition of most of the structure. The Dorchester Residents' Committee in cooperation with plaintiff conducted a second engineering study which more closely approximated the requirements. For many, though not all structural items, the useful life and replacement costs were set forth. Even with this additional study we might not find substantial compliance since some of the required data omitted may be relevant to making an informed decision. Plaintiff has, however, inserted into each agreement of sale a two year warranty on the structural portion of the building. While a close question is presented, in light of the two reports and the warranty we find that plaintiff has substantially satisfied City Council's concern that tenants have adequate information on the structural integrity of the building and expected replacement costs.

Accordingly, since plaintiff's supplemental notice will remedy the existing defects in its original notice under the circumstances of this case, we find that plaintiff's marketing program substantially complies with § 9–1204.

## APPENDIX A

### § 9–1204. Unfair Conversion Practices.

(1) It shall be unlawful for any owner, landlord, agent or other person operating or managing a multiple occupancy dwelling to convert said premises to a condominium, or to terminate a lease with a tenant or to make, alter, amend or modify any term or condition of any existing lease or arrangement of tenancy with a tenant for the purpose of converting the said premises to a condominium, unless

(a) the tenant has been notified in writing by Certified mail, return receipt requested, of the owner's intention to convert to a condominium by a date certain specified therein, which notice shall be delivered one year prior to the date of the scheduled conversion.

(b) the notice of intention to convert contains a statement informing the tenant then in possession of his or her exclusive right to purchase their unit at a specified price during the first 6 months of the notice period. During the right-to-purchase period, the owner or his agent cannot show the unit to other prospective buyers unless the tenant has in writing waived the right to purchase.

(c) the statement contains a specific statement of the total amount due on or before settlement of the purchase contract, including any initial or special condominium fees due.

(d) the statement contains information on the actual expenditures made on all repairs, maintenance, operation and upkeep of the subject property, including all taxes and utility payments, within the last three years, set forth tabularly with the proposed budget of the condominium and cumulatively broken down on a per unit basis.

(e) the statement contains a description of any provisions made in the budget for reserves for capital expenditures, or, if no provision is made for reserves, a statement to this effect.

(f) the statement contains a declaration as to the present condition of all structural components and major utility installations in the subject property, including the dates of construction, installation and major repairs, and the expected useful life of each item, together with the estimated cost (in current dollars) of replacing each of same.

(2) A tenant in possession at the time of the delivery of the notice referred to above, may not be required to vacate the premises prior to the expiration ·of the one year's notice period except for:

(a) non payment of rent;

(b) breach of a covenant in the existing lease;

(c) the tenant's having committed a nuisance or waste upon the property, or having caused the premises to be in violation of The Philadelphia Code.

(3) Any tenant in possession at the time of delivery of the aforesaid notice, whose lease would ordinarily terminate during the one-year period, is entitled to have the tenancy extended on the same terms and conditions until the expiration of the one-year period from the date of the notice.

(4) Any tenant in possession at the time of delivery of the notice may terminate his lease with 90 days' notice without penalty for termination.

(5) Tenants who take possession of a unit after the one year's notice provision is delivered pursuant to this section but before the date of actual conversion shall be notified in writing prior to the signing of the lease of the owner's intentions to convert to a condominium as of the specified date and given whatever information is requested by that tenant relative to the costs of purchasing that unit.

(6) No provision of this section can be waived or made subject to a contract between the parties depriving a tenant of the benefits of this section.

*(7) It is the policy of the City of Philadelphia that provisions in any contracts, leases or other undertakings which allow owners or their agents, at their option to cancel and terminate the terms of such leases upon any future possibility of conversion to a condominium, upon less than one year's notice as required by this section, shall be null and void as against public policy, except in the following case:*

*(a) If the term of the lease shall be less than one year between the date of original occupancy in the multiple occupancy dwelling and the date of conversion.*

## APPENDIX B

February 27, 1980

HAND DELIVER

Honorable Joseph L. McGlynn
United States Courthouse
Room 8614
601 Market Street
Philadelphia, Pennsylvania 19106

Re: *Sargo II, Inc., t/a The Dorchester on Rittenhouse Square Partners v. The City of Philadelphia, Civil Action No. 79–4655*

Dear Judge McGlynn:

. . . . .

Third, with respect to Section 9–1204(c) Your Honor inquired as to the feasibility of providing tenants with a pro forma statement of settlement costs. We have discussed this matter in detail with our client and determined that it is feasible to provide tenants with a specific statement of certain of the settlement costs. But, as to costs which relate to matters that are in the purchaser's control, and specifically financing costs, which are highly volatile in today's market, plaintiff cannot speculate as to those settlement costs. With regard to the provisions of Section 9–1204(c), we would prefer to be in substantial compliance with the Ordinance by stating the exact amount of costs we know and by refraining from guessing at costs it is impossible to project accurately. We do not want to mislead our tenants. Specifically, with respect to nonfinancing costs plaintiff proposes to provide the following to the tenants:

*Costs & Credits Not Related to Financing*

A. Specific amounts will be provided as to:

1. Purchase price (less earnest money deposit)—this shall be based upon the price set forth in the current "backup" agreement for the unit.

2. Real estate transfer tax (1% of purchase price).

3. Credit for security deposit (if any).

4. Reserves equal to two months' condominium assessment.

5. Available appliance and/or kitchen upgrade allowances or costs.

6. Recording fees.

B. Descriptions of settlement costs or credits which must be prorated based upon the settlement date shall be provided as follows:

1. Real Estate Property Taxes—the 1980 tax bill amount will be provided from which the pro rata amount can be computed once a settlement date is chosen.

2. Condominium assessment for the month in which settlement is held. The monthly assessment amount has been provided and the pro rata cost would depend on the day of the month on which settlement is held.

3. Pro rata share of rent (if any).

4. Interest on security deposit (if any) which shall accrue up to the settlement date.

The notice would also specifically describe the types of financing related settlement costs that the purchaser may incur with the various financing plans available through the Seller. The description shall not estimate the amount of each cost because that is almost entirely dependent on the mortgage principal amount.

*Settlement Costs Related to Financing Plans Available Through Seller*

1. Financing fees (ranges from 1% to 2½% of mortgage amount depending on financing plan used).

2. Mortgage interest—from date of settlement to date of first payment.
3. Some financing plans require: private mortgage insurance for financing in excess of 80% of the purchase price and attorney's review fee, while other plans assess a credit report cost. These variations will be fully described and, if possible, estimated.

With respect to financing plans other than those available through Seller, the notice shall describe the discount (3%) Seller has offered each purchaser who obtains his own financing. Plaintiff cannot speculate as to the types or amounts of financing related settlement costs for non-Seller affiliated lenders, except that all purchasers who will finance a portion of the purchase price will be informed of the cost for obtaining a mortgage title insurance policy.

We believe that this proposal adequately informs the tenants of the costs that may fairly be estimated, without the risk of disseminating misinformation.

In view of the need to assemble the additional information required in accordance with this letter, we propose to modify paragraph 7 of Robert Sheridan's affidavit, Exhibit "I" to our Motion for Summary and Declaratory Judgment, to extend the time in which the new notice to tenants will be sent out from 7 days to 10 business days following the entry of the proposed form of Order.

> Respectfully,
> /s/ Michael Sklaroff,
> For SCHNADER, HARRISON,
> SEGAL & LEWIS

cc: Barbara S. Gilbert, Esquire

### ORDER

AND NOW, this 10th day of MARCH, 1980, it is hereby ORDERED that plaintiff's motion for summary judgment be and the same is hereby GRANTED provided that plaintiff, within ten (10) days, issues a supplemental notice in accordance with the attached memorandum of decision.

Upon receipt of a copy of the supplemental notice sent pursuant to this Order, the City of Philadelphia is hereby ORDERED to issue any required permits or certification statements signifying that plaintiff has complied with Section 9–1204 of Title 9 of the Philadelphia Code (regulating the conversion of apartment dwellings to condominiums), and it is further ORDERED that the City of Philadelphia shall not delay the issuance of any other permits or certification statements on the ground that plaintiff has failed to comply with the above-mentioned provisions.